Spyros S. SKOURAS, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Spyros S. SKOURAS, Jr., Plaintiff,

v.

The UNITED STATES of America, Defendant.

Nos. 92 Civ. 2134(RPP), 92 Civ. 2135(RPP).

United States District Court, S.D. New York.

June 14, 1993.

964

Piper & Marbury by Alfred Ferrer, III, New York City, for plaintiffs Spyros S. Skouras and Spyros S. Skouras, Jr.

Mary Jo White, U.S. Atty. for the S.D. of N.Y. by Bernard W. Bell, Asst. U.S. Atty., New York City, for defendant, U.S.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs Spyros Skouras ("Skouras") and Spyros Skouras, Jr. ("Skouras Jr.") seek a refund each of $1,031.63 for payments each made personally toward the withholding tax obligation of Prudential Lines, Inc. ("PLI"), and an abatement of the 100% penalty, equal to the unpaid balance of the withholding taxes of PLI totalling $566,704.94, assessed against them by the Internal Revenue Service ("IRS") pursuant to section 6672 of the Internal Revenue Code, 26 U.S.C. § 6672 ("§ 6672"), for the first quarter of 1986. The Government filed counterclaims against each plaintiff, seeking from each the 100% penalty assessment for failure to pay the employer's portion of federal employee income taxes ("FIT") and Federal Insurance Contribution Taxes ("FICA") withheld from the wages of PLI employees for the first quarter of 1986. The Government now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Government's motion is granted.

### FACTUAL BACKGROUND

A. *The Plaintiffs*

The plaintiffs were officers and members of the Board of Directors and management of PLI, a corporation which operates a fleet of merchant vessels.

Plaintiff Skouras was PLI's Chief Executive Officer, President and Chairman of PLI's six-member Board of Directors from 1972 and throughout the relevant period. Def.'s 3(g) Statement ¶ 1, Exh. A; Skouras Dep. at 4. PLI's corporate bylaws vested in him, as Chief Executive Officer, "general

charge of the business and affairs of the Corporation" and provided him with power to "employ and discharge employees and agents of the Corporation." Bylaws, Art. IV, § 3, Bell Decl., Exh. 7. Skouras regularly reviewed monthly, quarterly and annual reports prepared by PLI's Financial Department. Skouras Dep. at 5–9.

Plaintiff Skouras Jr. was one of PLI's two vice presidents from November 1980 and through the relevant period. In July 1984, Skouras Jr., in his capacity as vice president, also assumed responsibility for supervising PLI's Finance Department, Def.'s 3(g) Statement ¶ 5, as well as PLI's sales, marketing, operations and administration departments. Skouras Jr. Dep. at 15–16. William Fleming, PLI's Controller in 1986, directed the Finance Department and reported directly to Skouras Jr. Def.'s 3(g) Statement ¶ 5; Skouras Jr. Dep. at 15–16.

PLI maintained approximately 14 corporate checking accounts during the first quarter of 1986. Bell Decl., Exh. 1. With respect to each of PLI's bank accounts, checks under $1,000 could be signed by one person and checks for more than $1,000 could be signed by two persons. Skouras and Skouras Jr. each were authorized to sign checks on every account maintained by PLI. On most accounts, the only two other people who could sign checks were either Martin Ytuarte, PLI's Executive Vice President, or Zaida Hertan, PLI's Assistant Controller.[1] Skouras Jr. frequently signed PLI's checks, while Skouras also occasionally signed PLI's checks. Def.'s 3(g) Statement ¶ 4.

PLI had a Cash Management Committee consisting of Skouras Jr., Ytuarte, and Nicholas Curcio, PLI's Treasurer. The Cash Management Committee met at least once a week for the purpose of overseeing PLI's finances. At such meetings, Curcio would advise the Committee of PLI's outstanding payables and receivables and the funds available to PLI. Either Skouras Jr. individually or the Cash Management Committee collectively would then determine, based on wheth-

---

1. During the first quarter of 1986, Ytuarte and Hertan co-signed several checks for over $1,000

without the signature of either plaintiff. *See* Notice of Filing Chemical Bank Checks.

er the receivables were actually collected, which payables would be paid. Skouras Jr. Dep. at 19–20; Ytuarte Dep. at 8–10. Checks would be signed at the meeting in accordance with those determinations. Skouras Jr. Dep. at 19.

### B. *The ODS Contract*

PLI received income primarily from two sources: (1) payments from customers for transport of cargo and (2) payments of Operating Differential Subsidy ("ODS") made by the United States Maritime Administration ("Marad") on behalf of the United States. The ODS payments were made pursuant to a congressionally mandated 20–year ODS contract dated December 29, 1977 ("ODS Contract"), between PLI and the United States [2] under a program created by the Merchant Marine Act of 1936, 46 U.S.C. §§ 1101–1294 (1975) ("ODS program"), which is intended to help American merchant vessel fleets from the United States compete with foreign fleets. As an operator of an American merchant vessel fleet, PLI was required under the Merchant Marine Act to enter into an ODS contract obligating it to participate in the ODS program in order to maintain its merchant vessel fleet. Pursuant to the ODS Contract, Marad made the ODS subsidy payments to PLI to reimburse it for the higher wages and wage related costs of its United States crews compared to those of foreign lines.

PLI's ODS Contract, as well as ODS contracts into which PLI had entered prior to December 1977, have at all times been with the United States. Marad has administered the ODS program since its inception, including individual subsidy/ODS contracts with various United States merchant marine fleets, and Marad's actions have at all times

been required to be in furtherance of the Merchant Marine Act.

Beginning in 1984, Marad followed the practice of paying ODS reimbursements of over $800,000 [3] to PLI upon presentation by PLI of a reimbursement voucher whenever a PLI vessel arrived in New York after the completion of a roundtrip voyage to designated travel points in the Mediterranean. Thus, the ODS payments were reimbursements for costs already incurred by PLI with respect to a voyage that had been completed pursuant to the ODS Contract, not advance payment of those expenses. Zok Dep. at 31; Compl. ¶ 30. PLI's operation depended on the prompt payment of ODS reimbursement payments by check or wire transfer each time a PLI vessel completed its roundtrip voyage and arrived in New York Harbor.[4]

Specifically, PLI came to rely on the ODS payments to pay certain of its day-to-day operating expenses, including employees' wages, suppliers and other creditors, as well as the employer's portion of withholding taxes due on PLI employee wages, which the ODS payments to PLI were also designed to reimburse pursuant to section II–20(a)(1) of the ODS Contract. Zok Dep. at 82–83.

Section II–18 of the ODS Contract provides for the "Withholding and Reduction of Subsidy Payments." Subsection (b) of section II–18 allows the United States to withhold ODS payments while PLI "is in default in any payments due the United States on account of any construction loan or construction agreement, charter party, ship sales mortgage notes, or any other obligation due the United States. The United States shall apply the amount so withheld to the satisfaction of such debt." ODS Contract § II–18(b), Ferrer Decl., Exh. B. Subsection (c) states that the amount of ODS reimburse-

---

**2.** Since 1937, the United States, under the mandate of the Merchant Marine Act, has maintained an ODS contract with PLI, renewing each contract after the 20–year term of the old contract expired. The ODS contract relevant to this litigation extended from December 29, 1977, through December 31, 1997. Zok Dep. at 13–14.

**3.** The Government describes the subsidy amount as the "difference between [PLI's] costs and the cost of foreign competitors for crew wages, ves-

sel insurance costs, and vessel maintenance and repair expenses." Def.Mem. in Supp. at 8.

**4.** The ODS subsidy generally was payable at the end of the month during which the applicable voyage or voyages had been completed. ODS Contract § II–20(a)(1). However, because of PLI's financial condition, Marad customarily paid PLI within a few days of the completion of each voyage. Zok Dep. at 75; Skouras Jr. Dep. at 34–35.

ment payment "shall be reduced under such terms and in such amounts as the United States shall determine for any periods in which any subsidized vessel is laid up." *Id.* § II–18(c).

The ODS Contract also authorizes the United States to:

> examine and audit the books, records, and accounts of [PLI and its affiliates] whenever it may deem it necessary or desirable, including but without limitation an analysis of the surplus and all supporting accounts. [PLI] agrees that any and all auditors, inspectors, attorneys, and other employees designated by the United States, shall have full, free and complete access at all reasonable times to all vessels owned by [PLI] when in port . . . and to all books, records, papers, memoranda or other documents of [PLI] wherever located. . . .

*Id.* § II–17(b).

Although Marad had inspection authority over PLI's finances, there was no representative or current employee of Marad on PLI's Board of Directors, Cash Management Committee, or management. Nor did any representative of Marad have any check signing authority at PLI. Def.'s 3(g) Statement ¶ 7. Furthermore, except for requiring that PLI's ships sail and return to New York before a subsidy was disbursed, there is no evidence on the record that Marad generally limited the manner in which PLI, as the subsidy recipient, could use the ODS subsidy payments that Marad actually made to it.

By 1986, PLI operated three vessels which it was authorized to use in its subsidized liner operations: the Lash Atlantico, the Lash Pacifico and the Lash Italia. PLI owned the Lash Italia, and it leased the Lash Atlantico and the Lash Pacifico pursuant to two 25–year bareboat charters. PLI had specifically constructed each vessel pursuant to its obligation under its ODS contract with the United States to replace PLI vessels after the statutory economic life of those vessels. ODS Contract § I–9, Ytuarte Dep., Exh. 3. The vessels had designated trade routes between ports on the East coast of the United States and ports in the Mediterranean Sea. Skouras Jr. Dep. at 91.

### C. PLI's Worsening Financial Condition

Starting in 1981, James Zok, then director of financial management at Marad, became aware that PLI was experiencing financial difficulty. Zok Dep. at 22. Between February 13, 1981, and November 30, 1982, in order to enable PLI to continue operating, Marad extended twenty-nine working capital loans totalling $8.7 million to PLI while continuing to make its usual ODS subsidy payments. Zok Decl., Exhs. 3–31. PLI provided Marad with promissory notes for repayment of each such loan. *Id.;* Bell Decl., Exh. 24.

Marad also guaranteed shipbuilding loans by banks to PLI to finance the building of the Lash Atlantico, Lash Italia, and Lash Pacifico. Thus, in the event of PLI's default of these shipbuilding loans, Marad was liable for the balance of the notes. Skouras Jr. Dep., 47–49.

By 1985, PLI had repaid only two of the original twenty-nine working capital loans from Marad to PLI. Pursuant to section II–18(b) of the ODS Contract, Marad, due to PLI's increasing debt to it, exercised a tighter review of PLI's corporate financial matters by exercising its right to receive detailed financial reports and audits and to inspect PLI's finances. In addition, by letter dated July 9, 1985, Zok informed PLI that Marad would begin unilaterally and automatically offsetting $40,000 from each ODS payment to PLI, to go toward repayment of the remaining working capital loans. Zok's letter stated that "while [Marad] is mindful of [PLI's] financial condition, recent difficulties in gaining your voluntary compliance with our agreed upon loan repayment schedule leaves us no alternative but to impose a collection schedule which will be automatically offset from your [ODS] vouchers." Ferrer Decl., Exh. C.

### D. First Quarter of 1986

IRS regulations, 26 C.F.R. § 31.6302(c)–1(b), require corporate employers to deposit in a federal depository, at the end of each eighth-monthly period (⅛ of a month), money withheld from employee wages for FIT and FICA taxes during that period. The corpo-

ration holds these funds in a "special fund in trust for the United States." 26 U.S.C. § 7501(a). PLI's last first quarter 1986 withholding tax payments were due April 7, 1986.

Reports of amounts of employee taxes withheld must be filed at quarterly intervals not later than the end of the month following each quarter. 26 C.F.R. § 31.6071(a)–1(a). Accordingly, a Form 941 quarterly return reporting the amounts withheld, together with the amounts remitted to the IRS during the quarter, was due from PLI on April 30, 1986, the last day of the month following the end of the first quarter of 1986, the relevant quarter of PLI's delinquency with regard to withholding taxes in this litigation.

As a matter of company practice at PLI, Mr. Fleming, PLI's Controller, would prepare and sign PLI's quarterly Form 941. Skouras Jr. co-signed a number of the checks for payment of withholding taxes. Ytuarte Dep., Exh. 1; Bell Decl., Exh. 3. On April 30, 1986, PLI filed with the IRS a Form 941 signed by Fleming. "The Form 941 reported that the following taxes had accrued during the first quarter of 1986: federal income tax ("FIT") withholding" totalling $400,811.85 and "social security tax[es] ("FICA")" totalling $318,249.66. Def.'s 3(g) Statement ¶ 8. In its Form 941, PLI "reported that PLI had made no payments on those obligations and no money" to satisfy those obligations "was sent in with the Form 941." [5] *Id.* Because only half of the FICA taxes are to be paid by the employer, the amounts withheld from PLI's employees but not paid over were $159,124.83 in FICA taxes and $400,811.85 in FIT taxes, for a total of $559,936.68 in tax liability.

Skouras and Skouras Jr. knew "throughout the first quarter of 1986" that "PLI was not paying over to the IRS when due amounts withheld from employee wages to satisfy the employees' FIT and FICA liabili-

ties." *Id.* ¶¶ 9–10; Skouras Jr. Dep. at 160. They state they relied on ODS payments to meet certain of these tax obligations, and several ODS payments were received during the first quarter. During the first quarter of 1986, PLI received from Marad four ODS subsidy payments totalling $2,667,328 and an additional ODS subsidy payment of $679,454 on April 10, 1986, for a "total of over $3.3 million in ODS subsidies during the period from January 1, 1986" the beginning of the first quarter, "through April 30, 1986," the date the first quarter Form 941 was due. *Id.* ¶ 13. In addition, "PLI received approximately $14 million in payments from its customers during" the first quarter of 1986. *Id.* ¶ 14. PLI received an additional $2.5 million from customers in April 1986. Bell Decl., Exh. 8. Plaintiffs claim, however, that because the total amount of Marad offset for repayment of working capital loans from ODS payments to PLI prior to May 1986 was $800,000, PLI had no obligation to make payments for FICA and FIT taxes on April 30, 1986. Pls.Mem. in Supp. at 36.

Throughout the first quarter of 1986, Skouras and Skouras Jr. also were aware that PLI was paying creditors other than the IRS. Def.'s 3(g) Statement ¶¶ 11–12. Indeed, during the first quarter of 1986, PLI made payments of approximately $10,925,577.89 [6] to creditors other than the IRS. *Id.* ¶ 15. Vendor Paid Listing, March 31, 1986 Report, at 66, Bell Decl. ¶ 16.

### E. *The Post–First Quarter Period*

"Marad did not stop paying ODS subsidies to PLI until on or after May 19, 1986." Def.'s 3(g) Statement ¶ 16. The termination of ODS payments to PLI was the result of the following series of events.

PLI failed to make the $618,820 payment due April 1, 1986 on its shipbuilding loans for the Lash Atlantico and the Lash Pacifico.[7] Bell Decl., Exhs. 16, 17; Zok Decl., Exh. 34.

---

5. According to the declaration of Michael Kelly, an employee of the IRS, however, "PLI did pay $4,217.20 on January 31, 1986 that was credited to PLI liability for the employer portion of FICA taxes for the first quarter of 1986." Kelly Decl. ¶ 3.

6. This figure excludes approximately $1,065,000 spent in connection with transfers from one PLI bank account to another.

7. PLI also missed its $347,248 payment, due May 1, 1986, on its United States-guaranteed loan for the Lash Italia's shipbuilding costs.

By letter dated May 2, 1986, the Irving Trust Company, which originally had extended the shipbuilding loans, declared its intent to call upon the United States to satisfy its guarantees on these two loans, Bell Decl., Exh. 30, which had an outstanding balance of over $9 million, Zok Decl., Exhs. 35–36.

On May 5, 1986, a foreign creditor to whom PLI owed approximately $200,000 arrested PLI's leased vessel, the Lash Atlantico, in Naples, Italy. In exchange for release of the ship, PLI agreed to transfer the lien on the Lash Atlantico to the next PLI vessel that would arrive in Italy, the Lash Italia. PLI also agreed to pay part of the amount owed the creditor out of expected ODS payments due when the next PLI vessel, the Lash Pacifico, arrived in New York on May 8, 1986. Skouras Jr. Dep. at 97–105; Zok Dep. at 33.

On May 8, 1986, PLI submitted the form voucher to Marad for the payment of $883,540 in ODS subsidy due for the completion of the Lash Pacifico's roundtrip voyage. Marad refused to pay the voucher, however, until PLI presented a viable two-month cash plan, for May and June 1986, for repayment of its debts to Marad during that period. Skouras Jr. Dep. at 109.

On May 14, 1986, PLI presented its two-month cash plan at a meeting with Marad administrators in Washington, D.C.. PLI's plan, contained in a one page document, set forth the income PLI expected to receive and the creditors it expected to pay between May 13 and June 27, 1986. The plan did not allot any money for satisfaction of withholding tax delinquencies owed in trust to the United States, but did allot funds for gross wages of PLI employees during the period covered by the plan. Skouras Dep. at 133–34; Ferrer Decl., Exh. 33. After several hours of discussion at the meeting, Marad approved PLI's cash plan. Zok Dep. at 78. Accordingly, on May 15, 1986, Marad released $843,540 [8] in ODS funds as payment for the arrival of the Lash Pacifico in New York on May 8. Def.'s 3(g) Statement ¶ 16. By letter to Marad dated May 15, 1986, Irving Trust called upon Marad to satisfy the United States' guarantee on the defaulted shipbuilding notes for the Lash Atlantico and the Lash Pacifico. *See* Bell Decl., Exhs. 5–6.

Thereafter, PLI "began to implement the cash plan by making payment to various creditors out of the ODS funds, [and] reopening negotiations with those creditors who had arrested PLI's vessels." Pls.Mem. in Supp. at 46. Meanwhile, plaintiffs were aware of, but failed to eliminate, PLI's arrearages in withholding tax payments before paying creditors other than the IRS. Def.'s 3(g) Statement ¶¶ 9–12.

On May 19, 1986, the Lash Atlantico arrived in New York from Naples, and PLI submitted a voucher for $833,052 in ODS subsidy accrued for the voyage the Lash Atlantico had just completed. Skouras Jr. Dep. at 154–55; Ytuarte Dep., Exh. 5. Marad refused to make the ODS payment on the voucher, citing section 609 of the Merchant Marine Act, 46 U.S.C. § 1179, and section II–18(b) of the ODS Contract, both of which authorized Marad to withhold all ODS payments due should PLI be in default on any debts owed the United States.[9] PLI's default on the Lash Atlantico, Lash Pacifico and Lash Italia shipbuilding notes had not been cured, and the delinquencies in repayment of Marad's working capital loans to PLI remained. Zok Decl. ¶ 42.

On June 10, 1986, Marad, as guarantor of the Lash Atlantico and Lash Pacifico shipbuilding notes, paid Irving Trust $9,783,851. Zok Decl., Exh. 36; Bell Decl., Exhs. 5, 6. On June 24, 1986, Marad paid $2,898,345 as guarantor of the Lash Italia note. Zok Decl., Exh. 36.

---

8. This amount reflects the amount of the voucher minus Marad's automatic offset of $40,000.

9. Section 609 of the Merchant Marine Act provides:

The Secretary of Transportation shall withhold the payment of operating-differential subsidy while any contractor therefor is in default in any payments due on account of construction-loan, ship-sales mortgage notes, or any other obligation due the United States, and shall apply the amount so withheld to the satisfaction of such debt.

46 U.S.C. § 1179 (Supp.1993).

### F. *PLI's Bankruptcy*

In September 1986, an involuntary petition of bankruptcy was filed against PLI in the United States Bankruptcy Court for the Southern District of New York. PLI converted the case to a voluntary Chapter 11 petition for reorganization. Bell Decl., Exh. 27.

During the bankruptcy proceedings, PLI initiated an adversary proceeding against Marad, asserting claims arising out of Marad's termination of ODS subsidy payments to PLI in May 1986. Ytuarte Dep., Exh. 6. In addition, PLI's management attempted to restore operations and to pay PLI's withholding tax arrearages by, among other things, collecting trade credits due for cargoes carried and resolving a number of PLI's litigation claims against others. MacEwen Dep. at 28–29.

The Skourases ultimately submitted a plan for reorganization. On December 15, 1989, however, the Bankruptcy Court approved a competing reorganization plan presented on October 2, 1989, by Cold Spring Shipping, L.P., and the Skourases lost control of PLI. *See* Skouras Jr. Dep. at 181–82; Ferrer Decl., Exh. N (Order confirming plan of reorganization); Bell Decl., Exh. 27.

On September 12, 1986, the IRS filed a proof of claim in the Bankruptcy Court for outstanding internal revenue taxes totalling $1,705,858.08, including unpaid withholding taxes for the first quarter of 1986. Bell Decl., Exh. 25. By agreement dated December 14, 1989 (the "IRS Agreement"), the IRS agreed to permit PLI, under the new management of Cold Spring Shipping, to pay its tax liabilities in installments, requiring immediate payment of approximately $75,000, and thereafter equal quarterly installments over a period not exceeding four years.[10] IRS Agreement ¶ 3(i)–(ii), Bell Decl., Exh. 27. The Agreement provided, however, that those persons who were "corporate officers, directors, or other responsible parties of Prudential Lines, Inc. prior to ... September 1986" would still be liable under applicable law for any of the tax delinquencies that

were the subject of the proof of claim. *Id.*, Agreement ¶ 4.

On May 6, 1990, after PLI had made a payment to the IRS of $75,476.72 pursuant to the Agreement, the IRS filed a second proof of claim in which it reduced its claim to $1,614,307.35. On June 13, 1990, PLI, under the new management of Cold Spring Shipping, entered into a stipulation and order dismissing with prejudice PLI's claims against Marad in the adversary proceeding. *See* Bell Decl., Exh. 28, at 1.

By stipulation dated September 26, 1990, PLI and the IRS entered into a revised agreement pursuant to which the IRS allowed new PLI management to forgo the installment payments of withholding tax liability, except for a single installment which had already been paid. Under this revised agreement, the IRS consented to have the outstanding balance of its claim against PLI paid out of a general disbursement trust fund established as part of PLI's Chapter 11 reorganization to pay creditors of PLI. *Id.* at 2. The revised agreement further exempted from liability for the outstanding balance the management, shareholders and officers and directors of the reorganized PLI. However, the IRS retained the right of recourse for payment of the outstanding balance against "persons who were officers, directors, or other responsible parties of PLI prior to ... September 1986." *Id.* at 3.

### G. *Procedural History*

On November 29, 1989, the IRS had assessed the Skourases, as responsible corporate officers under 26 U.S.C. § 6672, for PLI's unpaid withholding tax liability for the first quarter of 1986 in the amount of $566,-704.94. Compl. ¶ 4. On December 29, 1989, Skouras and Skouras Jr. each paid $1,031.63, the tax for one PLI employee for one quarter, and then filed an administrative claim for refund of the amount paid and for an abatement of the balance of the assessment. *Id.* ¶ 5. Their claims for refund and abatement were denied. *Id.* ¶ 6.

---

**10.** Under 11 U.S.C. § 1129(a)(9)(C), a debtor must be allowed six years from the date of assessment in which to pay priority tax claims.

The liability for the first quarter 1986 withholding taxes was assessed against PLI on June 16, 1986. Bell Decl., Exh. 24.

On March 29, 1990, plaintiffs commenced the instant action, claiming: (1) that they were not responsible corporate officers within the meaning of § 6672 because Marad's delay in paying the May 8, 1986 ODS payment and its refusal to pay the ODS subsidy due May 19, 1986, precluded timely payment of the withholding taxes when due; (2) that they did not act willfully within the meaning of § 6672 in failing to direct payment of the withheld taxes to the IRS, again because Marad's refusal to provide ODS payments in May 1986 precluded PLI from having funds to satisfy its withholding tax obligations; and (3) that the IRS is estopped from collecting the withholding and trust fund tax arrearages from plaintiffs because the IRS agreed to accept installment payments of the liability from PLI during the course of settling its bankruptcy claim.

## DISCUSSION

Summary judgment is appropriate if the evidence offered demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and the Court must view the facts in the light most favorable to the non-moving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962).

## I. SECTION 6672 LIABILITY

■ Section 6672 of the IRS Code was designed to "ensure that employers would comply with their obligation to withhold taxes and to pay the taxes withheld by subjecting the employers' officers responsible for the withholding and payment of taxes to personal liability." *Smith v. United States,* 894 F.2d 1549, 1553 (11th Cir.1990) (citing *Slodov v. United States,* 436 U.S. 238, 247, 98 S.Ct. 1778, 1785, 56 L.Ed.2d 251 (1978)). Section 6672 provides that officers who fail to account and pay over withholding taxes are liable for a penalty equal to the taxes not paid over, as follows:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts to in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not account for and paid over.

26 U.S.C. § 6672. "Section 6671(b) defines 'person,' for purposes of § 6672, as including 'an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs.' " *Slodov v. United States,* 436 U.S. 238, 245, 98 S.Ct. 1778, 1784, 56 L.Ed.2d 251 (1978).

[2, 3] It is well settled that § 6672 "requires two elements to be present before personal liability for unpaid withholding taxes attaches: first, the individual must be a person responsible for the collection and payment of withholding taxes, *i.e.,* he must have the authority to direct the payment of corporate funds; second, the individual's failure to comply with the statute must be willful." *Hochstein v. United States,* 900 F.2d 543, 546 (2d Cir.1990) (citations omitted), *cert. denied,* — U.S. ——, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992). The assessment of the tax penalty pursuant to § 6672, however, "creates a *prima facie* case of liability." *Carter v. United States,* 717 F.Supp. 188, 191 (S.D.N.Y.1989) (citing *Lesser v. United States,* 368 F.2d 306, 310 (2d Cir.1966) (en banc)).

### A. *Responsible Person*

■ In determining whether an individual is responsible for collecting and paying withholding taxes, the Court should consider several factors, "including the individual's duties as outlined in the corporate bylaws, his ability to sign checks, his status as an officer or director, and whether he could hire and fire employees." *Hochstein,* 900 F.2d at 547 (citing *Gephart v. United States,* 818

F.2d 469, 473 (6th Cir.1987)); *see Carter*, 717 F.Supp. at 192. "The central question, however, is whether the individual has significant control over the enterprise's finances." *Hochstein*, 900 F.2d at 547 (citations omitted). "Control" in the context of § 6672 is broadly construed: "[D]ay to day control is ... unnecessary for a finding of responsibility" under § 6672 so long as the individual enjoyed significant "power to compel or prohibit the allocation of corporate funds." *Carter*, 717 F.Supp. at 192 (quoting *Schwinger v. United States*, 652 F.Supp. 464, 466–67 (E.D.N.Y.1987)).

■ Plaintiffs claim that they were not "responsible persons" within the meaning of § 6672 for purposes of paying PLI's FIT and FICA taxes during the first quarter of 1986 because Marad exercised considerable control over PLI's finances by administering the ODS payments. They contend that these payments were critical to PLI's financial viability and ability to pay withholding taxes.[11]

Marad's control over and subsequent termination of the ODS payments to PLI do not absolve plaintiffs of responsibility under § 6672 for paying the PLI withholding taxes at issue.

■ First, Marad's alleged acts of control occurred after PLI violated § 6672 by failing, on April 30, 1986, to pay PLI's FIT and FICA taxes for the first quarter of 1986 when due. Second, pursuant to 46 U.S.C. § 1179 and section II–18(b) of its ODS Contract with PLI, Marad had a right to recoup PLI's debt to the Government by withholding all ODS payments to PLI if PLI was in default on payment of its $8.7 million debt for loans extended or guaranteed by Marad. Marad's withholding of the ODS payments in this case does not make it responsible for

remitting to the IRS PLI's FIT and FICA taxes and absolve plaintiffs from doing the same. *Lawrence v. United States*, 299 F.Supp. 187, 190 (N.D.Tex.1969).[12]

■ Bearing in mind that plaintiffs have the burden of proof on the issue of responsible person liability, *id.* at 548, the Court finds that, given their corporate role and authority within PLI, both plaintiffs exercised significant, though perhaps not exclusive, control over PLI's finances, and are "responsible persons" within the meaning of § 6672.

Skouras was Chairman of the Board, Chief Executive Officer and President of PLI. As Chief Executive Officer, Skouras was in general charge of all business of PLI, had the authority to sign checks and hire and fire employees, and regularly reviewed monthly, quarterly, and annual reports prepared by PLI's Financial Department. Skouras Jr. was a member of the Board of Directors and Vice President of PLI, enjoyed the power to sign checks, and oversaw PLI's finances in the financial department. In addition, through his participation on PLI's Cash Management Committee, Skouras Jr., either independently or in conjunction with Ytuarte and Curcio, at least weekly made the detailed, initial decisions regarding the order in which PLI's creditors were to be paid.

The fact that, pursuant to the ODS contract and its regulatory authority, Marad exercised inspection control over PLI's disbursement of funds to obtain knowledge of how PLI's funds were spent does not shield plaintiffs from the charge that they exercised sufficient control over PLI's finances to be deemed responsible for collection and payment of PLI's withholding taxes.

11. As the primary example of Marad's control over PLI in this regard, plaintiffs cite Marad's decision on May 19, 1986, to terminate the ODS payments to PLI and its delay in making the May 6, 1986, ODS payment to PLI, which, according to plaintiffs, was crucial to PLI's regaining the Lash Pacifico.

12. In addition, more than one person may be "responsible" for the collection and payment of withholding taxes, *see Kalb v. United States*, 505 F.2d 506, 511 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975),

and the existence of another person wielding significant influence over a corporation's finances does not preclude a corporate official from being a "responsible person" within the meaning of § 6672. *Gephart v. United States*, 818 F.2d 469, 476 (6th Cir.1987); *Kalb*, 505 F.2d at 511. Thus, "it is not necessary that an individual have the final word as to which creditors should be paid in order to be subject to liability under [§ 6672]. Rather, it is sufficient that the person have significant control over the disbursement of funds." *Hochstein*, 900 F.2d at 547.

Accordingly, plaintiffs are responsible persons under § 6672. *Kalb*, 505 F.2d at 510; *Hochstein*, 900 F.2d at 546–47.

## B. *Willfulness*

 "A person willfully fails to pay withholding taxes within the meaning of section 6672 when he pays other creditors with knowledge that withholding taxes are due." *Hochstein*, 900 F.2d at 548. Evidence of a voluntary, conscious, and intentional preference of other creditors over the IRS, or of reckless disregard of the risk of nonpayment of the tax liability, presumptively establishes the requisite willfulness on the part of the responsible person. *Barnett v. United States*, 594 F.2d 219, 222 (9th Cir.1979); *Kalb*, 505 F.2d at 511. Willful conduct need not "reflect 'an evil motive or an intent to defraud.'" *Carter*, 717 F.Supp. at 193 (quoting *Kalb*, 505 F.2d at 511).

 It is undisputed that throughout the first quarter of 1986, plaintiffs knew that their FIT and FICA taxes for the quarter were delinquent and that PLI was paying creditors other than the IRS. Plaintiffs argue, however, that their failure to collect and pay the FIT and FICA taxes for the first quarter of 1986 was not willful because (1) in May 1986 Marad unexpectedly deprived PLI of its unrestricted discretionary funds [13] and (2) plaintiffs relied upon and expected to receive such funds to pay PLI's delinquent taxes. They claim that their decision to prefer creditors over the IRS during the 1986 quarter was involuntary and designed to save their business.

 The willfulness requirement contained in § 6672 makes no exception on the ground urged by plaintiffs where the withholding taxes for a quarter are past due. Here, the issue of willfulness turns on the intentions and acts of plaintiffs, as responsible corporate officers on April 7, 1986, when PLI's withholding taxes were due to be remitted to the IRS. *See Newsome v. United States*, 431 F.2d 742, 746 (5th Cir.1970); *Thibodeau v. United States*, 828 F.2d 1499, 1505–06 (11th Cir.1987). Since employee

withholding taxes are held in trust for the United States pursuant to 26 U.S.C. § 7501(a), plaintiffs bear the burden of showing that there were no funds available to PLI to pay the IRS when they became aware of PLI's withholding tax liabilities for the relevant dates such taxes were due during the first quarter of 1986. *See Carter*, 717 F.Supp. at 191.

Marad neither delayed nor terminated the ODS payments until on or after May 19, 1986, when the Lash Atlantico arrived in New York. This was approximately one month after PLI had failed to pay over withholding taxes to the IRS, the last of which were due April 7, 1986. Accordingly, plaintiffs' failure to pay PLI's withholding taxes due for the first quarter of 1986 is willful because all of Marad's conduct cited by plaintiffs as the reason for not paying these taxes occurred after the taxes were past due. *See Barnett*, 594 F.2d at 222 (plaintiff willfully failed to remit taxes in quarters where there had been no unexpected withdrawal of funds by third party bank prior to the date taxes were due). Nor have plaintiffs presented any evidence that PLI had insufficient funds to pay its FIT and FICA tax liabilities on any of the relevant due dates during the first quarter. Indeed, it is undisputed (1) that "Marad paid PLI over $3.3 million in ODS subsidies during the period from January 1, 1986 through April 30, 1986," Def.'s 3(g) Statement ¶ 13; (2) that PLI "received approximately $14 million in payments from its customers" during the first quarter of 1986, *id.* ¶ 14; and (3) that PLI had enough money during the first quarter of 1986 to make "payment of approximately $10 million to creditors other than the IRS." *Id.* ¶ 15.

Plaintiffs rely on *Barnett* and *Glenwal–Schmidt, Joint Venture v. United States*, 78–2 U.S. Tax Cas. (CCH) ¶ 9610, 1978 WL 4527 (D.D.C.1978), to argue that Marad's termination of ODS payments rendered involuntary plaintiffs' failure to pay PLI's withholding taxes when due. Plaintiffs' reliance on *Barnett* is misplaced, however, because the

---

**13.** Specifically, plaintiffs claim that Marad's withholding of the ODS payment due on May 19, 1986, deprived PLI's management of the ability

to use this ODS payment to bring PLI's withholding taxes current if it appeared that PLI would not continue operating.

corporation of the responsible officer in that case was deprived of funds by a creditor-bank *before* certain withholding taxes were due, and therefore was unable timely to remit those taxes to the IRS. *See Barnett,* 594 F.2d at 221–22.[14] *Glenwal–Schmidt* also is inapposite, for two reasons. First, as in *Barnett,* the corporation responsible for paying taxes in *Glenwal–Schmidt* was deprived of necessary funds before the withholding taxes were due for the relevant quarter. Second, *Glenwal–Schmidt* concerned the application of 26 U.S.C. §§ 6651(a)(2) and 6656 rather than § 6672. Sections 6651(a)(2) and 6656 differ significantly from § 6672 in that they expressly provide that a penalty may not be assessed when the corporation or delinquent taxpayer shows that its failure timely to pay is "due to reasonable cause and not due to willful neglect."

Accordingly, plaintiffs' failure to pay the government the withholding taxes due for the first quarter of 1986 was willful within the meaning of § 6672.[15]

### C. *Reasonable Cause*

■■■ Plaintiffs argue that they had reasonable cause to act as they did in failing to pay PLI's FIT and FICA taxes when due during the first quarter of 1986 and therefore are not liable under section 6672.

■■■ A reasonable cause defense to a claim of willfulness under § 6672 is of "very limited application." *See Kalb,* 505 F.2d at 509 (citing *Newsome,* 431 F.2d at 746–47 & n. 11). A "[t]axpayer's expectation that sufficient funds would be available at the end of the tax quarter does not make his behavior any less willful" and is not ground to assert a

reasonable cause defense. *Thibodeau,* 828 F.2d at 1506; *Wall v. United States,* 592 F.2d 154, 163 (3d Cir.1979) (failure to pay withholding taxes "in the hope that things would get better" and that taxes would eventually be paid does not constitute reasonable cause). Accordingly, Plaintiffs were without reasonable cause (1) to pay PLI employees their net wages without paying the FIT and FICA taxes thereon to the United States, and (2) to prefer creditors over the IRS during the first quarter of 1986, based on the belief that PLI would have sufficient funds in the near future to erase PLI's withholding tax delinquencies for the first quarter of 1986.[16]

### II. ESTOPPEL

■■■ Plaintiffs contend that the Government is estopped from assessing a 100% penalty against them pursuant to § 6672 because (1) after PLI filed for bankruptcy, the IRS agreed in December 1989 to permit PLI's new management, Cold Spring Shipping, to pay the reorganized corporation's withholding tax obligation in installments; (2) in the Spring of 1986, Marad withheld from each subsidy payment due PLI an amount in repayment of its working capital loans larger than the tax assessment claimed by the IRS in this action; and (3) Marad by its positions in the bankruptcy proceeding "deprive[d] plaintiffs of control over the cash in the bankruptcy estate that plaintiffs could have used to pay the taxes claimed in this action." Pls.Mem. in Supp. at 67.

Plaintiffs offer no arguments in support of claims (2) and (3). As for claim (1), the Second Circuit has held that "an individual's liability under section 6672 is separate and

---

14. In contrast, Barnett, the responsible officer, was found to have willfully failed to remit withholding taxes in prior quarters in violation of § 6672, on the ground that during those quarters there had been no unexpected withdrawal of funds by the bank prior to the date the taxes were due. 594 F.2d at 222. Thus, in *Barnett,* the corporation could be said to have been holding the withholding taxes in trust for the United States. In the present case there is no claim that such a fund was in existence and depleted by any action other than PLI's then management.

15. Because the Court finds that plaintiffs voluntarily, consciously and intentionally failed to pay

withholding taxes when due, there is no need to address whether plaintiffs acted with reckless disregard of the risk of non-payment of such taxes.

16. As Thomas MacEwen, PLI's then Vice President of operations, testified at his deposition, prior to May 1986, PLI's then management "felt that the taxes would be paid with the proceeds from the subsidy payment and other cash in the corporation. . . . [T]hat proved to be a bad assumption when [Marad] withheld the payments" to PLI. MacEwen Dep. at 28–29.

distinct from the corporation's tax liability," *Hochstein,* 900 F.2d at 549 (citations omitted), and that the IRS's compromise of a claim against a bankrupt corporation does not release responsible corporate officers from their direct liability or shield them from a 100% penalty under § 6672, *Spivak v. United States,* 370 F.2d 612, 615–16 (2d Cir.), *cert. denied,* 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967); *see Hochstein,* 900 F.2d at 549 (citing *Spivak*); *accord Smith,* 894 F.2d at 1555. The only case upon which plaintiffs rely in support of their proposition, *McCarty v. United States,* 437 F.2d 961, 194 Ct.Cl. 42 (1971), does not reflect the law of this Circuit under *Spivak. See Reph v. United States,* 615 F.Supp. 1236, 1243 (N.D.Ohio 1985). Accordingly, the IRS's settlement of claims against PLI in bankruptcy proceedings in 1989 and 1990 does not now estop it from assessing and collecting a 100% penalty against plaintiffs pursuant to § 6672 for PLI's FIT and FICA taxes past due for the first quarter of 1986. Furthermore, when Cold Spring Shipping assumed control of PLI in October 1989, it had no duty under § 6672 to use new revenues generated after October 1989 to satisfy the withholding tax liabilities incurred for a tax period preceding its control. *See Slodov,* 436 U.S. at 251–60, 98 S.Ct. at 1787–92.

## III. DAMAGES

 Finally, plaintiffs contend that the Government has failed to demonstrate the amount of FIT and FICA withholding taxes still due from PLI for the first quarter of 1986. This argument does not defeat defendant's motion for summary judgment.

The Skourases were assessed a principal amount of $549,401.73. There is no evidence on the record that during the first quarter of 1986 PLI made any payments toward its employees withholding tax liabilities for that quarter. The PLI checks to the IRS during the period from January 1, 1986 through May 8, 1986, all show that the checks were payments of liability for quarters other than the first quarter of 1986. Indeed, on the Form 941 filed by PLI on April 30, 1986, PLI itself asserted that it had made no payments to satisfy its first quarter 1986 employee withholding tax liabilities. Accordingly, there is no evidence that PLI's FIT and FICA tax delinquencies for the first quarter of 1986 were less than the amount assessed.

### CONCLUSION

For the reasons set forth above, the Government's motion for summary judgment pursuant to Rule 56 is granted.

IT IS SO ORDERED.